Isaac Nutovic, Esq.
NUTOVIC & ASSOCIATES
Proposed Counsel to the
 Debtors and Debtors-in-Possession
488 Madison Avenue, 16th Floor
New York, New York 10022
(212) 421-9100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re

**C2 MEDIA LLC, et al**

                                    Debtor
----------------------------------------------------------x

Chapter 11

Case No. 10-10783
(Jointly Administered)

**MOTION FOR ORDERS (I) SCHEDULING HEARING TO
CONSIDER SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'
ASSETS, FREE AND CLEAR OF ALL LIENS, CLAIMS AND
ENCUMBRANCES, SUBJECT TO HIGHER AND BETTER OFFERS;
(II) APPROVING (A) BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (B)
BIDDING PROCEDURES FOR THE CONDUCT OF AN AUCTION; (III)
FIXING MANNER AND NOTICE OF SALE HEARING; (IV) AUTHORIZING
THE DEBTORS TO SELL ASSETS,
FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES,
<u>SUBJECT TO HIGHER AND BETTER OFFERS</u>**

TO THE HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

C2 Media LLC, C2 Media, Inc., Keogh & Co., C2 Technology, Inc and C2 Media Canada Holdings LLC (the "Debtors" or "C2 Media"), the debtors and debtors in possession, herein (collectively, the "<u>Debtors</u>"), by their proposed counsel, Nutovic and Associates, makes this motion (the "<u>Motion</u>"), pursuant to sections 105 and 363 of Title 11 of the United States Code, as amended (the "<u>Bankruptcy Code</u>"), for:

(A) entry of an order (the "Sale Procedures Order") substantially in the form annexed as **Exhibit A**:

    i.    fixing the date and time of a hearing (the "Sale Hearing") to consider approval of a certain asset purchase and sale agreement and all ancillary transaction documents (collectively, the "Sale Agreement" attached hereto as **Exhibit B**) by and between certain of the Debtors and Vomela Specialty Company (the "Purchaser"), dated as of February 23, 2010, pursuant to which the Debtors propose to sell substantially all of their assets including the assets of a Canadian subsidiary (collectively, the "Assets"), free and clear of all liens, claims and encumbrances, subject to higher or better offers,

    ii.    approving a break-up fee (the "Break-Up Fee") and bidding procedures (the "Bidding Procedures") to be utilized in connection with the Auction of the Assets to be held prior to the Sale Hearing (the "Auction"),

    iii.    fixing the manner and form of notice of the Sale Hearing and approving the Notice substantially in the form annexed as **Exhibit C**, and

(B) after the Sale Hearing, entry of an order substantially in the form annexed as **Exhibit D**, approving the Sale Agreement and authorizing the sale of the Assets pursuant to section 363(b) of the Bankruptcy Code and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), free and clear of claims, liens and other encumbrances. In support thereof, the Debtors respectfully represent, as follows:

## JURISDICTION AND VENUE

    1.    On February 18, 2010 (the "Petition Date"), the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code and have continued in the management and operation of their business and property as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

    2.    No committee or trustee has been appointed in the Debtors' Chapter 11 cases

    3.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157

and 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). The statutory predicates for the relief sought herein are sections 105(a), 363(b), (f), (m) and (n) of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004 and 9014. Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. §157(b). Venue is proper before this Court pursuant to 28 U.S.C. §1409.

## BACKGROUND

4. C2 Media, together with a wholly owned Canadian subsidiary, C2 Media Canada ULC, is a leading single source provider of digital and screen printed media graphics in North America. Through its North American network of company owned and operated sales and production facilities, C2 Media offer customers the ability to print high quality media graphics for both indoor and outdoor use in varying shapes, sizes, colors and quantities.

5. Examples of the kinds of products which C2 Media produces are: In-Store – exhibits, backlit signage, toppers, window graphics, banners, end caps, floor graphics, wall graphics and in-store displays. Outdoor – banners, translights, billboards, building wraps and outdoor pole signs. Transit – bus advertising, fleet graphics, transit signage, phone kiosks and bus shelters. On-Demand Digital Printing – presentation catalogs, brochures, direct mail, presentation covers, pitch books, sales kits, reports and color copies.

6. As of December 31, 2009, the unaudited consolidated balance sheet of the Debtors' and their Canadian subsidiary, reflects assets of $17,030,580 and liabilities of $21,062,809. The Debtors currently have approximately 205 employees in eight (8) states and a further 65 individuals are employed by the Canadian subsidiary.

7. C2 Media LLC and C2 Media Inc (f/ka/ C2 Media.com Inc.) were

3

previously debtors before this court after filing chapter 11 petitions on October 10, 2001. Subsequent to the entry of an order of United States Bankruptcy Judge Gerber confirming a joint plan on September 7, 2004, their jointly administered cases were closed.

8. The Debtors' financial difficulties stem from a confluence of events. Like many other industries, the printing industry has been severely affected by the global economic recession over the last 2 years. Unfortunately, the Debtors' financial position has eroded more than many other businesses since customer advertising budgets are among the first areas of cost cutting in any economic downturn. Because of the duration and depth of the current recession, the efforts of management to sustain operations under their current structure have been unavailing.

9. Independent of the general recession, the printing industry is facing its own inherent difficulties due to changes in technology and fierce price competition. The rampant growth and availability of electronic print media has adversely affected much of the printing and publishing industry, including demand for hard print media. These and other challenges have resulted directly in a deterioration of the Debtors' finances to the point that they require the protection of the bankruptcy laws.

10. Together with this application proposing to sell virtually all of their assets free and clear of all liens, claims and encumbrances, subject to higher or better offers (the "Asset Sale"), the Debtors have filed a motion seeking approval of the terms of a consensual cash collateral facility with Bank of America (the "Lender"), their pre-petition lender, which asserts a claim of approximately $7.35 million, secured by liens on substantially all of the Debtors' assets. The cash collateral facility is designed to enable the Debtors to ensure continuity of service to their valuable customer base, thus maximizing asset values for the benefit of their creditors and

estates.

11.     By seeking bankruptcy protection, the Debtors will be able to protect and preserve their assets and businesses for the benefit of their creditors and employees. These proceedings will enable the Debtors to transition their business to a financially sound purchaser, maximize the value of the Debtors' strong goodwill, provide employment to many of their valued employees, and sustain a significant and trusted trading partner for their customer base. In addition, through the Chapter 11 process, the Debtors will be able to maximize the value of any remaining assets for the benefit of the estates and their creditors.

12.     No committee or trustee has been appointed in the Debtors' Chapter 11 cases.

## **MARKETING THE ASSETS FOR SALE**

13.     Prior to the Petition Date, the Debtors pursued various avenues to enable the businesses to continue in operation in an effort to maximize the value of their assets as a going concern and stave off liquidation.  These efforts have including attempts to identify a strategic investor for the businesses and/or an acquirer for all or a portion of the assets.

14.     Within the past year, the Debtors' management team prepared financial and operational materials for dissemination to potential investors and/or acquirers of all or a portion of the Debtors' assets and/or businesses and engaged an investment banking firm, Corporate Fuel Advisors LLC, to assist in their review of materials and marketing efforts.  Over a period of several months, the Debtors solicited expressions of interest from approximately 135 buyer candidates. Of those 20 were actively engaged in understanding the acquisition opportunity and received confidential information memoranda.

15.     The Debtors, through Corporate Fuel Advisors LLC, have updated their financial and operational materials and intend to continue solicitation of offers for the Assets from parties previously solicited.

16. Purchaser is the only party with a currently effective written offer to acquire the Debtors' assets and businesses on a going concern basis. Purchaser, based in Minnesota, is one of the largest American specialty graphic printing companies and offers services the same as or similar to the Debtors in complementary markets. Purchaser's Offer has been memorialized in the Sale Agreement for which the Debtors now seek approval. The Debtors believe that the Offer is fair and reasonable but wish to expose the adequacy of the Offer to the auction marketplace. The Debtors believe that with the Offer from the Purchaser as a floor and the Debtors' ability to transfer the Assets free and clear of liens, claims and encumbrances pursuant to an Order of the Bankruptcy Court, there is a potential for a competitive bidding process for the Assets.

## **THE SALE AGREEMENT**

17. The Sale Agreement is a comprehensive, purchase and sale agreement setting forth all the rights and obligations of the Debtors and the Purchaser. The Sale Agreement provides a vehicle for (i) preserving the vast majority of the jobs of 270 employees and (ii) the disposition of substantially all of the Debtors' assets (including the assets of a Canadian subsidiary). At the same time, it enables the Debtors to canvass the marketplace for any higher and better offers for the Assets.

18. The following is a summary of the salient terms of the Sale Agreement. To the extent there is any discrepancy between this summary and the terms of the Sale Agreement, the terms of the Sale Agreement shall control. Capitalized terms not defined herein shall have the meanings ascribed to them in the Sale Agreement:

> Purchased Assets: The Sale Agreement contemplates the Debtors will transfer to Purchaser all of the Assets (other than the Excluded Assets) on the terms and subject to the conditions set forth in the Sale Agreement, consisting of *inter alia* (a) accounts receivable (b) inventory (c) leases (d) equipment (e) copyrights trademarks and trade names, customer lists, general intangibles and goodwill (f) contracts (g) software (h) prepaid expenses and (i) all assets not specifically excluded The sale of the Assets will be free and clear of all claims, liens and

other encumbrances.

Excluded Assets: The Debtors are not selling to the Purchaser and the Assets do not include, among other things, (a) the Debtors' records relating to the formation and organization of the Debtors (b) rights under the Sale Agreement (c) stock or equity interests in any of the Debtors or the Canadian Sub (d) cash on hand at closing or (e) any avoidance claims and actions of the Debtors under sections 544, 545 and 547 through and including 551 of the Bankruptcy Code.

Purchase Price: The purchase price for the Assets is cash in the aggregate amount of $6,400,000 ( the "Purchase Price") subject to adjustment based on a formula set forth in section 2.3 of the Sale Agreement (designed to compensate for changes in the Debtors' financial condition as of the Closing Date).

Record Retention: The parties will take steps to preserve and keep records related to the Assets for a period following the closing of the transaction.

Conditions: The conditions to closing are set forth in Article VI of the Sale Agreement. They include, among other things, (a) the accuracy of representations and warranties of the Parties as of the Closing Date, (b) marketable title to the Assets, (c) consents to assignments required by the Sale Agreement and (d) the acceptance of employment by employees of the Debtors required by the Purchaser. (Purchaser anticipates hiring a substantial majority of the Debtors' 270 employees.)

No Assumed Liabilities: Except as specifically provided in the Sale Agreement, the Purchaser is not acquiring any debts or obligations of the Debtors.

19. Extraordinary Provisions. The Sale Agreement requires a deposit which is not held by the Debtors and does not serve as liquidated damages for a breach by the Purchaser or bidder. The Sale Agreement also calls for payment to the Lender of a portion of the proceeds of sale without court order. The Lender is fully secured and is not recovering the full amount of its debt by releasing its liens in order to allow the sale to take place. In exchange for releasing its liens the Lender is requiring payment of all but $1,435,000 of the proceeds to it.

**THE SALE IS SUPPORTED BY SOUND BUSINESS
JUDGMENT AND SHOULD BE APPROVED**

34. The Debtors submit that the terms of the Sale Agreement are fair and reasonable, and that ample authority exists for the approval of the sale of the Assets to the

Purchaser. Section 363(b) of the Bankruptcy Code provides that a debtor-in-possession, after notice and a hearing, may use, sell, or lease property of the estate other than in the ordinary course of business. In pertinent part, the section provides:

> (b)(1) The trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

*See* 11 U.S.C. § 363(b)(1).

35. In order for a court to approve a request for the use of property of the estate outside the ordinary course of business, the court must find that the proposed course of action is supported by sound business reasons. *See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2nd Cir. 1983); *see also In re Chateaugay Corp.,* 973 F.2d 141 (2d Cir. 1993); *Bartel v. Bar Harbor Airways, Inc.,* 196 B.R. 268, 273 (S.D.N.Y. 1996); *In re Caldor, Inc.- NY,* 193 B.R. 182, 187 (Bankr. S.D.N.Y. 1996); *In re Thomas McKinnon Securities, Inc.,* 120 B.R. 301 (Bankr. S.D.N.Y. 1990). In reviewing such proposed transactions, courts should give substantial deference to the business judgment of the debtor-in-possession. *See e.g., Esposito v. Title Inc. Co. of Pa. (In re Fernwood Mkts.),* 73 B.R. 616, 621 n.2 (Bankr. E.D. Pa. 1987).

36. The Debtors submit that consideration of these factors militates in favor of this Court's approval of a section 363(b) sale process. Prior to the Petition Date, the Debtors canvassed the marketplace for potential investors and/or acquirers. Because no party has been willing to invest in the business, the Debtors have determined that they are unable to promulgate a plan of reorganization on a stand-alone basis. Although the Debtors' believe they have sufficient funds to continue to operate pending the Sale Hearing, the Debtors are concerned that unless they are permitted to undertake an asset sale and close the transaction by the end of

March, 2010, they will lose the value of their assets. The Debtors believe that conducting an auction sale process will maximize the prospect of a sale of the Assets on a going concern basis. If no higher bids are received approval of the Sale Agreement provides the Debtors the ability to maximize the value of its assets.

37. Based upon the foregoing, the Debtors submit that the Sale Agreement and the proposed sale of the Assets is in the best interests of the Debtors, their estates, and their creditors, and is based upon sound, reasoned and informed business judgment warranting this Court's approval. *See In re Lionel Corp.,* 722 F.2d at 1071; *Bar Harbor Airways, Inc.*, 196 B.R. at 273; *In re Caldor, Inc. - NY*, 193 B.R. at 187.

38. The Debtors and the Purchaser seek findings that the transactions contemplated by the Sale Agreement are (a) subject to the protections afforded to "good faith" purchasers under section 363(m) of the Bankruptcy Code and (b) not subject to avoidance under section 363(n) of the Bankruptcy Code. Section 363(m) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under section (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

*See* 11 U.S.C. § 363(m). In addition, section 363(n) of the Bankruptcy Code provides, in pertinent

part, that:

> The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property

> sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount . . . [including] punitive damages . . . .

11 U.S.C. § 363(n).

39. The negotiations and the resulting transaction contemplated by the Sale Agreement are the result of good faith and arm's length negotiations between the Debtors and the Purchaser and resulted in a Purchase Price that is both fair and reasonable in light of the circumstances. At the Sale Hearing, the parties will adduce evidence in support of the foregoing and will request that the Court incorporate findings on these matters as part of the Order approving the sale.

## THE SALE SHOULD BE APPROVED FREE AND CLEAR OF ALL LIENS AND ENCUMBRANCES

40. Pursuant to section 363(f) of the Bankruptcy Code, after notice and a hearing, a debtor may sell property of the estate free and clear of all liens and encumbrances. In pertinent part, the section provides:

> (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if-
>
> (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which the property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Here, the Pre-Petition Lender has agreed to the sale of the Assets.

## BIDDING PROCEDURES

41. The Debtors and the Purchaser recognize that the sale of the Assets must be subject to higher and better offers pursuant to applicable bankruptcy law. The Purchaser is prepared to consent to subject its offer to higher and better bids provided it receives overbid protection and the Court approves the Break-Up Fee and appropriate bidding procedures are put in place. Set forth below are the proposed Bidding Procedures to be employed with respect to the Auction (if any):

a. <u>Alternative Bid Deadline</u>. All alternative bids must be submitted to the Debtors, c/o their bankruptcy counsel, Nutovic & Associates, 488 Madison Avenue, 16th Floor, New York, New York 10022, Attn: Isaac Nutovic Esq. by a date fixed by the Bankruptcy Court (the "<u>Alternative Bid Deadline</u>").

b. <u>Due Diligence</u>. To the extent any proposed bidder wants to undertake any due diligence with respect to the Assets, such proposed bidder must execute a non-disclosure agreement (to the extent such an agreement has not been previously executed and delivered by such proposed bidder) in form and substance acceptable to the Debtors prior to undertaking any such due diligence and all such due diligence must be undertaken and completed prior to the Alternative Bid Deadline.

c. <u>Qualified Bid</u>. Only alternative bids that meet with the following qualifications will be considered a "<u>Qualified Bid</u>" by the Debtors:

  i. the bid must be <u>received</u> by the Debtors' bankruptcy counsel, Nutovic & Associates, 488 Madison Avenue, 16th Floor, New York, New York 10022, Attn: Isaac Nutovic Esq, by the Alternative Bid Deadline; and

  ii. The bid must be accompanied by a good faith deposit in immediately available funds of no less than $250,000 and by a duly executed sale agreement, substantially similar to the Sale Agreement and marked to reflect

                variations thereto, but in no event shall such sale agreement be less favorable to the estate than the terms of the Sale Agreement.

      iii.      The proposed purchase price for a Qualified Bid shall be an amount in cash of at least the sum of $6,800,000 (the "Initial Overbid"). In the event a bidder (including Purchaser) is the second best bidder (the "Back-Up Bidder"), its bid shall be irrevocable and such bidder shall remain ready, willing and able to purchase the Assets through the closing of the transaction with the successful bidder.

      iv.      Without limiting the generality of the foregoing, such bid shall be for the Assets and any liabilities to be assumed under the Sale Agreement on an as-is, where-is basis and shall not include any due diligence, financing or other contingency.

      v.      Simultaneously with the delivery of the down payment deposit and the executed Sale Agreement, an entity submitting an alternative bid shall deliver financial information to Debtors' counsel evidencing that such party has the financial wherewithal to consummate the proposed transaction on the terms proposed. Such financial information may include current audited or verified financial statements and/or a letter from a depository institution indicating the ability to close on a proposed transaction. In the event the financial information pertains to the parent corporation of an acquisition affiliate, the bid of the affiliate shall be guaranteed by the parent.

      vi.      The entity submitting an alternative bid shall also provide evidence or affirm under oath that all necessary approvals have been obtained authorizing the submission of the bid by such entity.

      vii.      Only those bidders having submitted Qualified Bids (a "Qualified Bidder") will be permitted to participate in the Auction. The Debtors will promptly notify each alternative bidder after the Alternative Bid Deadline whether it is a Qualified Bidder.

d.      Auction Procedures and Bidding Increments.

     i.    At the Auction (A) all bids shall be made and received in one room, on an open basis, and all other bidders shall be entitled to be present for all bidding with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each bid will be fully disclosed to all other bidders throughout the entire Auction; (B) the opening bid at the Auction shall not be less than the Initial Overbid; (C) all offers subsequent to the opening bid at the Auction (*i.e.*, the Subsequent Incremental Bid Amount) must exceed the prior offer by not less than $50,000; (D) bidding at the Auction will continue until such time as no further bids are made within the time limit announced by the Debtors;

    ii.    The Auction will be conducted openly and each Qualified Bidder will be informed of the terms of the previous bid;

    iii.    Upon conclusion of the Auction, the Debtors shall determine the highest or otherwise best bid (the "Successful Bidder"), and such bid shall be submitted for approval by the Bankruptcy Court;

    iv.    The Successful Bidder(s) shall have the burden of establishing by competent evidence that it qualifies for section 363(m) protections;

    v.    If the Debtors do not receive any Qualified Bids, the Debtors will report the same to the Bankruptcy Court and will proceed with the Sale Hearing and no Auction shall be held;

    vi.    The Debtors reserve the right to establish such other reasonable rules and procedures for the conduct of the Auction, provided that such rules and procedures are publicly announced at the Auction.

 Break-Up Fee. A Break-Up Fee shall be payable to Purchaser by the Successful Bidder at the time of closing, if a person other than the Purchaser is determined to be the Successful Bidder the Purchaser shall receive the Break-Up Fee in the amount of $250,000.plus up to $100,000 in expenses. Should the Purchaser rebid it will be entitled to take a credit for the Break-Up Fee including expenses.

### THE BIDDING PROCEDURES ARE REASONABLE AND SHOULD BE APPROVED

42.    Bankruptcy Rule 6004(f)(1) provides that a sale of property outside of the ordinary course of business may be by private sale or public auction. The Debtors believe that

subjecting the Offer to higher or better bids will ensure the maximization of the value of the Assets. The Debtors submit that the Bidding Procedures are fair and reasonable and should be approved. They afford the Debtors the opportunity to subject the Assets to competitive bidding while preserving the Purchaser as a stalking horse bidder and thereby providing a floor price for the Assets.

43. The Bidding Procedures will also ensure that the Sale Hearing is conducted in a fair and orderly manner, and that participants are *bona fide* bidders with ability and desire to consummate any proposed transaction. The Initial Overbid will ensure that the competitive bidding process compensates the Debtors for the cost of the Break-Up Fee and permits the Debtors to derive an added economic benefit from any such bids. The Subsequent Incremental Bid Amount reflects a fair and reasonable increment that should encourage competitive bidding and ensure that there is a true economic benefit to the Debtors and their estates for each successive bid.

44. The Break-Up Fee is intended to compensate the Purchaser for its out of pocket expenses, the time expended by its staff in connection with the pursuit of this transaction, and as an incentive for the Purchaser to serve as the Debtors' stalking horse bidder and subject the Assets to competitive bidding. The amount of the Break-Up Fee is the result of good faith, arm's length negotiation among the parties. *See In re: Integrated Resources, Inc.,* 147 B.R. 650, 658 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2nd Cir. 1993); *In re: 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (Break-up fee which is the result of good faith, arm's length agreement and not tainted by self-dealing should be upheld).

45. In the instant case, the proposed Break-Up Fee is a fair and reasonable in relation to the proposed Purchase Price in light of the funds and efforts expended by the

Purchaser to consummate this transaction. The Debtors submit that the Break-Up Fee is a reasonable and appropriate protection for the Purchaser as it serves to move the process forward. Accordingly, the Debtors respectfully request that this Court enter an order approving the Break-Up Fee and Bidding Procedures in the form annexed hereto as Exhibit C.

**THE DEBTORS REQUEST THAT THE COURT SCHEDULE THE SALE HEARING SO AS TO ALLOW FOR A MARCH CLOSING AND FIX THE MANNER AND NOTICE OF SAME**

46. The purpose of the Sale Hearing is to approve the sale of the Assets to the Purchaser, or such other bidder as may tender a higher or better offer at the Auction. The Debtors respectfully request that the Sale Hearing be scheduled at the earliest possible time given the exigencies of their cash flow. The Debtors currently project that starting in April they will have insufficient cash flow to conduct full operations and the value of their assets will degrade. This will result in a reduction of the Purchase Price which allows for downward adjustment to the purchase price if the value of the assets deteriorates. Bankruptcy Rule 2002(a)(2) provides for twenty (20) days' notice of a "proposed use, sale or lease of property of the estate other than in the ordinary course of business . . . ." Thus, it is requested that the Court schedule the Auction and Sale Hearing during the week of March 15, 2010. The Debtors submit that such relief is reasonable and appropriate under the circumstances.

47. The Debtors propose that a true and complete copy of the proposed pre-fixed Order Scheduling Hearing, this Motion, together with all exhibits be served upon: (a) counsel to the Purchaser, (b) Bank of America, by its counsel (c) all entities known to assert a lien, claim, interest or encumbrance in the Debtors' assets; (d) the twenty (20) largest creditors of each of the Debtors; (e) the United States Attorney's Office for the Southern District of New York; (f) all parties that have previously expressed interest in acquiring all or a portion of the

Debtors' assets; and (g) the Office of the United States Trustee.

48. The Debtors further request that the Court approve the form of notice annexed as **Exhibit B** hereto (the "Notice"). The Debtors propose to serve a copy of the Notice upon (a) all known creditors of the Debtors; (b) all federal, state and local taxing authorities in which the Debtors operate businesses; and (c) all parties that have filed a notice of appearance in these cases.

## NO PREVIOUS REQUEST

49. No previous application for the relief sought herein has been made by the Debtors to this or and other court.

**WHEREFORE,** the Debtors respectfully requests that this Court (a) enter an order fixing the date and time of a Sale Hearing to consider approval of the Sale (b)) the Sales Procedures Order fixing the manner and form of notice of the Sale Hearing and approving the Bidding Procedures and the Break-Up Fee; (c) enter an order, authorizing the sale of the Debtors' Assets pursuant to sections 105(a), 363(b), (f), (m) and (n) of the Bankruptcy Code and Bankruptcy Rule 2002, 6004, and (d) grant the Debtors such other and further relief as this Court deems just and proper.

Dated:	New York, New York
	February 23, 2010

                          Respectfully submitted,

                          NUTOVIC & ASSOCIATES
                          Proposed Attorneys for Debtors and Debtors in Possession

                          By:   *s/Isaac Nutovic*
                                Isaac Nutovic, Esq.
                                488 Madison Avenue, 16th Floor
                                New York, New York 10022
                                Telephone: (212) 421-9100